MARC E. MAYER (SBN 190969)
  mem@msk.com
KARIN G. PAGNANELLI (SBN 174763)
  kgp@msk.com
MITCHELL SILBERBERG & KNUPP LLP
2049 Century Park East, 18th Floor
Los Angeles, CA  90067-3120
Telephone: (310) 312-2000
Facsimile: (310) 312-3100

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION - SPRING STREET

| | |
|---|---|
| PROXIMA BETA PTE. LIMITED, d/b/a "Tencent Games" a Singapore Corporation, and KRAFTON, INC., a Korea Corporation,<br><br>Plaintiffs,<br><br>v.<br><br>ANDREW MARTIN a/k/a Asyhole; ANDRE SWIRSZCZUK a/k/a Girabaldi; SAMAD AHMED a/k/a Samad Hossain a/k/a Haxsamad, a/k/a Sharpshooter Bangladesh and DOES 1 through 6, inclusive,<br><br>Defendants. | CASE NO. 2:21-cv-2056<br><br>**COMPLAINT FOR:**<br><br>**(1) TRAFFICKING IN CIRCUMVENTION DEVICES;**<br><br>**(2) INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS;**<br><br>**(3) UNFAIR COMPETITION**<br><br>**Demand For Jury Trial** |

Proxima Beta PTE. Limited d/b/a "Tencent Games" ("Tencent") and

Krafton, Inc. ("Krafton") (collectively, "Plaintiffs") aver as follows:

## **PRELIMINARY STATEMENT**

1.     Collectively, Plaintiffs own, operate, and/or publish the online

multiplayer game titled "Player Unknown's Battlegrounds Mobile" ("PUBGM").

By this lawsuit, Plaintiffs seek to put a stop to the Defendants' unlawful, for-profit

sale and distribution of malicious software products designed to harm PUBGM's

1  multiplayer experience by enabling members of the public to gain unfair

2  competitive advantages (*i.e.* to cheat) in PUBGM.

3      2.    Defendants are a group of individuals working in concert under

4  various business or trade names, including "GMSPack," "Sharpshooter,"

5  "AutoSkillz" and "CheatNinja."  CheatNinja, purportedly a joint effort between the

6  owners of GMSPack, Sharpshooter, and AutoSkillz, has described itself as "the

7  leading mobile game cheat developer and publisher since 2018."  Defendants,

8  largely doing business under the CheatNinja business name and via the CheatNinja

9  website (www.cheatninja.com), are in the business of creating, marketing, selling,

10  distributing, otherwise exploiting a portfolio of malicious cheats and hacks for

11  PUBGM, including the "SharpShooter PUBG Mobile Android Cheat" and the

12  "SharpShooter PUBG Mobile iOS Cheat" (collectively, the "Cheating Software").

13  The Cheating Software enables players to manipulate PUBGM to their personal

14  advantage, such as by automatically aiming weapons, revealing the locations of

15  opponents, and allowing the player to see a vast array of information that otherwise

16  would be obscured.

17      3.    Defendants' conduct has caused, and is continuing to cause, massive

18  and irreparable harm to Plaintiffs and their business interests.  The commercial

19  success of Plaintiffs' business depends upon its games being enjoyable and fair for

20  all players, and Plaintiffs spend an enormous amount of time and money to ensure

21  that this is the case.  Defendants' sale and distribution of the Cheating Software,

22  especially in the United States, has caused Plaintiffs to lose millions of dollars in

23  revenue, and to suffer irreparable damage to their goodwill and reputation.

24      4.    In creating, marketing, selling, servicing, and distributing the

25  Cheating Software, Defendants have engaged in numerous unlawful acts under

26  United States and California law.  Defendants have violated Section 1201 of the

27  Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1201(b)(1), by selling,

28  importing, offering, providing, and otherwise trafficking in technologies that

Mitchell Silberberg & Knupp LLP
12945486.4

2

circumvent or evade technologies used by Plaintiffs to detect the Cheating Software and protect the integrity and commercial value of PUBGM. Defendants also have knowingly, intentionally, and maliciously interfered with and disrupted the user contracts Plaintiffs have with their customers in the United States, which explicitly prohibit the precise type of cheating that Defendants enable by their Cheating Software. Defendants not only know that their conduct is unlawful, but they engage in such conduct with the deliberate intent to harm Plaintiffs and their business. Plaintiffs are entitled to monetary damages, injunctive and other equitable relief, and punitive damages against Defendants.

## JURISDICTION AND VENUE

5.      This is a civil action seeking damages, injunctive relief, and other equitable relief under the anti-circumvention provisions of the DMCA, 17 U.S.C. § 1201; and the laws of the State of California.

6.      This Court has subject matter jurisdiction over Plaintiffs' claims for copyright infringement and violation of the DMCA pursuant to 28 U.S.C. §§ 1331 and 1338(a). Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiffs' state law claims for intentional interference with contract and unfair competition, which are so related to Plaintiffs' claims under the DMCA as to be part of the same case or controversy.

7.      This Court has personal jurisdiction over Defendants because they have purposefully directed their activities at the United States, and at California in particular, have purposefully availed themselves of the benefits of doing business in California, and have established a continuing presence in California. Plaintiffs are informed and believe, and on that basis allege, that, without limitation:

        (a)     Defendants conduct extensive and ongoing business with users in the United States and the State of California;

Mitchell
Silberberg &
Knupp LLP
12945486.4

3

(b)     Defendants distribute the Cheating Software in the United States and the State of California, advertise and market the Cheating Software in the United States and the State of California, and communicate directly with users in the United States and in the State of California, including for the purposes of soliciting purchases of the Cheating Software by such users and providing technical support for the Cheating Software;

(c)     Defendants have entered into, and continue to enter into, contracts with individuals in the United States and in the State of California, including contracts pursuant to which these individuals license from Defendants the right to install and use the Cheating Software.  In return for such licenses, Defendants receive ongoing recurring daily, weekly, or monthly payments from individuals in the United States and the State of California; and

(d)     Defendants contract with entities located in the United States and the State of California in connection with their businesses.  This includes, for example, domain name registries, hosting or content delivery services, as well as credit card processors and merchant banks.

8.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because this is a judicial district in which a substantial part of the events giving rise to the claims occurred, and/or in which Plaintiffs' injury was suffered.

**THE PARTIES**

9.     Plaintiff Proxima Beta d/b/a "Tencent Games" is a Singapore-based corporation and a member of the Tencent group of companies.  Tencent publishes and operates the popular online mobile game PUBG Mobile (or "PUBGM") in the United States.

10.     Plaintiff Krafton, Inc. is a South Korea-based video game development and publishing company in the business of creating, distributing, and maintaining a portfolio of computer and console games.  Krafton is the successor

in interest to the company PUBG Corporation and is the owner of U.S. copyrights in PUBGM.

11.    Plaintiffs are informed and believe, and on that basis allege, that Defendant Andrew Martin (a/k/a Asyhole) is an individual residing in Canyon Country, California.  Plaintiffs are informed and believe, and on that basis allege, that Martin has been a high-level employee of two prominent providers of Cheating Software, "GMSPack" and "Autoskillz," including through CheatNinja's predecessor website at www.gmspack.com, and is or has been among the chief moderators or administrators of the CheatNinja.com website.  In that role, Martin markets, advertises, promotes, and otherwise facilitates the sale of the Cheating Software.

12.    Plaintiffs are informed and believe, and on that basis allege, that Defendant Andre Swirszczuk (a/k/a Geribaldi) is an individual residing in or about Rudolstadt, Germany.  Plaintiffs are informed and believe, and on that basis allege, that Swirszczuk is one of the founders of two prominent providers of Cheating Software, "Autoskillz" and "Sharpshooter Corporation," and is among the lead developers and/or marketers of the Cheating Software.  Plaintiffs are informed and believe, and on that basis allege, that Swirszczuk also is or has been one of the administrators of the website www.sharpshooterdevelopers.com, which has promoted the Cheating Software offered by www.gmspack.com and provided links to the CheatNinja.com website.  Swirszczuk has claimed that among the goals of the Sharpshooter Project is to "create a new market for PC-like mobile Multiplayer Hacks" and create "the worlds[sic] biggest CHEATERCOMMUNITY in the History of mobile Games."  Plaintiffs are informed and believe, and on that basis allege, that Swirszczuk is and/or has been among the individuals chiefly responsible for creating, producing, maintaining, marketing, advertising, supporting, and monetizing the Cheating Software.

13.     Plaintiffs are informed and believe, and on that basis allege, that Defendant Samad Ahmed a/k/a Samad Hossain a/k/a Haxsamad, a/k/a Sharpshooter Bangladesh is an individual residing in or about Cumilla, Bangladesh.  Plaintiffs are informed and believe, and on that basis allege, that Hossain distributes and re-sells the Cheating Software through the website www.cheatninja.io.

14.     Plaintiffs are informed and believe, and on that basis allege, that defendant Doe 1 a/k/a Glacier, Doe 2 a/k/a lllllllll, Doe 3 a/k/a MRMTT, and Doe 4 a/k/a Sanguis are or were administrators of the CheatNinja website and message board and/or their predecessor versions at www.gmspack.com.  In that role, these individuals communicate with Plaintiffs' customers in order to support and enable their use of the Cheating Software, and serve as liaison to, and/or themselves operate as, developers of the Cheating Software.  Among other activities, Glacier and lllllllll assist customers in operating the Cheating Software, give advice to customers as to how to avoid being caught or detected by Plaintiffs for using the Cheating Software, and communicate to users about updates and improvements to the Cheating Software.  Glacier and lllllllll also are involved in recruiting, hiring, and communicating with individual resellers of the Cheating Software.  The true names and capacities, whether individual, corporate, associate, or otherwise, of Glacier and lllllllll are unknown to Plaintiffs, which have therefore sued said Defendants by such aliases and fictitious names.

15.     Plaintiffs are informed and believe, and on that basis allege, that Doe 5 a/k/a Rolan and Doe 6 a/k/a SSshooter are, along with Martin, "Global Moderators" of Cheat Ninja, and/or its predecessor website at www.gmspack.com. In that role, these individuals market, advertise, promote, and otherwise facilitate the sale of the Cheating Software, including by recruiting, hiring, and communicating with individual "resellers" of the Cheating Software.  The true names and capacities, whether individual, corporate, associate, or otherwise, of

Mitchell
Silberberg &
Knupp LLP
12945486.4

6

1    Rolan and SSshooter are unknown to Plaintiffs, which have therefore sued said

2    Defendants by such aliases and fictitious names.

3         16.    The true names and capacities, whether individual, corporate,

4    associate, or otherwise, of the Doe defendants are unknown to Plaintiffs, which

5    have therefore sued said defendants by such aliases and fictitious names.  These

6    defendants include individuals whose real identities are not yet known to Plaintiffs,

7    but who are acting in concert with one another, often under the guise of Internet

8    aliases, in committing the unlawful acts alleged herein.  Plaintiffs will seek leave to

9    amend this complaint to state their true names and capacities once said

10   Defendants' identities and capacities are ascertained.  Plaintiffs are informed and

11   believe, and on that basis aver, that all Defendants sued herein are liable to

12   Plaintiffs as a result of their participation in all or some of the acts set forth in this

13   Complaint.  (All of the aforementioned Defendants, both the named Defendants

14   and the Doe Defendants, are referred to herein collectively as "Defendants.")

15        17.    Plaintiffs are informed and believe, and on that basis allege, that at all

16   times mentioned in this complaint, each of the Defendants was the agent of each of

17   the other Defendants and, in taking all actions averred in this Complaint, each was

18   acting within the course and scope of such agency.

19

20   **<u>FACTS APPLICABLE TO ALL CLAIMS</u>**

21   **<u>PUBG Mobile</u>**

22        18.    Tencent Games is the operator and publisher of the video game titled

23   "Player Unknown's Battlegrounds Mobile" ("PUBGM") in the United States.

24   PUBGM is the mobile version of the immensely popular game "Player Unknown's

25   Battlegrounds" ("PUBG"), owned and distributed by PUBG Corporation.

26        19.    PUBGM is a mobile game app available for both Android and Apple

27   (iOS) devices, such as smartphones, tablets, and other portable devices.  Like the

28   original game, PUBGM is a fast-paced online action and survival game.  In its

Mitchell
Silberberg &
Knupp LLP

12945486.4

classic, "Battle Royale" mode, up to 100 players compete to be the last one standing in a fight-to-the-death competition. In this mode, players parachute onto a large, computer generated battlefield; scrounge for weapons, armor, vehicles, and other survival tools (*e.g.*, bandages, backpacks, camouflage), and attempt to eliminate other players and remain alive while the battlefield shrinks in size. PUBGM also offers smaller eight-player matches and a "zombies" mode, where a small group of players attempts to remain alive against dozens of computer-controlled zombie opponents.

20.    PUBGM matches are intense and highly competitive affairs, with each participant vying for a limited number of weapons, ammunition, vehicles, health packs, and other materials that the player needs to survive. Players of PUBGM may play the game casually or in "ranked" matches for a place on a global leaderboard. Additionally, PUBGM is played in thousands of "esports" tournaments around the world, many of which offer cash prizes to the winner or winners. These tournaments draw hundreds or thousands of viewers and dedicated fans. Highly ranked players also often enjoy paid positions with team organizations, lucrative endorsement deals, and income from paid subscriptions to hugely popular live streams of game play.

21.    The success of PUBGM rests in part on Plaintiffs' ability to offer a consistently compelling player experience so that their customers remain invested in the game and play it for a sustained period of time. Especially given the substantial competition and live stream economy that has grown with, and around, PUBGM, a vital part of that player experience is the fairness and integrity of the game. Accordingly, Plaintiffs invest an enormous amount of time and money to ensure that all players stand on equal footing and have a fair chance to defeat their opponents and progress in the game. Maintaining proper game balance is absolutely critical to the game's success. If that balance is artificially upset, or if there is a perception that players are cheating or have an unfair advantage, then

players will grow frustrated with the game and stop playing.  That, in turn, could disrupt and/or destroy the entire PUBGM community.

### Plaintiffs' Efforts To Protect Against Hackers And Cheaters

22.     Because PUBGM is such a popular game, unscrupulous individuals and companies such as Defendants constantly seek to exploit the game for their own personal gain and profit, knowing that by doing so they are ruining the experience for other players and harming Plaintiffs and their business interests. For this reason, Plaintiffs undertake tremendous effort to protect the integrity of the game through both technical and contractual means.

23.     First, in order to prevent users from cheating or otherwise unfairly exploiting PUBGM, the game contains a number of technological measures designed to detect whether players are using software that allows them to cheat in the game.  When detected, the players are prevented from accessing and playing PUBGM.  As a result, for any hack or cheat software to be effective, it must be designed to prevent or avoid detection.  For years, Defendants have been playing a "cat-and-mouse" game, such that each time new or improved technology that detects whether a player use of the Cheating Software is developed or deployed, Defendants update or modify the Cheating Software to avoid and/or circumvent those technological measures.

24.     Second, in order to access, download, or play PUBGM, users must create and register a PUBGM account, and in doing so must expressly manifest their assent to the End User License Agreement and Terms of Use (collectively, the "TOU.")  The entire text of the TOU is displayed to users at the time they register for a PUBG account, as well as each time the TOU is updated.  The TOU is available in its entirety online at pubgmobile.com/terms.html.

25.     The TOU includes a conditional, limited license agreement between Tencent and its users.  Under the TOU, Tencent licenses the right to download,

copy, install, and play PUBGM, subject to certain terms, restrictions, and conditions.  Among other provisions, the TOU expressly prohibits players from "us[ing] cheats, exploits, automation software or any unauthorized third party software designed to modify or interfere with [PUBGM]" or from "disabl[ing] or circumvent[ing]" any technical measures designed to prevent unauthorized uses of PUBGM.

26.    PUBGM is made available to the public exclusively through Plaintiffs' proprietary servers and matchmaking system.  Thus, it is not possible for a user to lawfully obtain access to or play PUBGM without expressly consenting to the TOU.

## Defendants And Their Unlawful Conduct

27.    Plaintiffs are informed and believe, and on that basis allege, that Defendants collectively are or were engaged in developing, updating, marketing, distributing, selling, and supporting the PUBGM Cheating Software, including the "SharpShooter PUBG Mobile Android Cheat" and the "SharpShooter PUBG Mobile iOS Cheat."  Defendants have marketed, sold, and offered customer support for the PUBGM Cheating Software via the CheatNinja website and through authorized "resellers" that, in turn, advertise the Cheating Software through message board postings on the CheatNinja website and other websites dedicated to hacking and cheating.

28.    The CheatNinja website claimed that CheatNinja is the "leading mobile cheat developer & publisher since 2018."  CheatNinja is a "rebrand" of three pre-existing cheating and hacking developers and sellers that purportedly "joined forces":  "Autoskillz," "SharpShooter," and "GMSPack."  According to the CheatNinja website, "Autoskillz" is "one of the world's first game cheat developer[sic] to explore the mobile landscape;" "Sharpshooter" is a "top mobile cheat developer" whose software "laid the foundation of the mobile cheat

Mitchell
Silberberg &
Knupp LLP
12945486.4

industry;" and "GMSPack" is a "professional cheat sales team, dedicated to providing technical support, marketing and promotion services for individual developers and teams through cheats' life cycle."  Plaintiffs are informed and believe, and on that basis allege, that in addition to selling preexisting software products, CheatNinja offers publishing services (*i.e.,* marketing, distribution, customer support, and other related services) to third party developers who have created cheating software and wish to market and sell that software to the public.

29.    Among the products offered for sale by CheatNinja (and, formerly, by GMSPack and other predecessor websites) is the PUBGM Cheating Software.  The Cheating Software, first offered through www.gmspack.com and then through the CheatNinja website, purports to enable PUBGM players to cheat in the game by, *inter alia*, automatically aiming a player's weapon, expanding a player's field of vision, illuminating opponents, and displaying information such as the locations and health status of hidden or obscured opponents or the location of "valuable items."  For example, CheatNinja advertises the SharpShooter PUBG Mobile Android cheat as follows:

> The first and most advanced PUBG Mobile external cheat.  Win games with ease.
>
> Keep track of the status and exact location of all enemies at all times with player ESP (boxes, skeletons, HP, distance, weapons, etc.), and with precise aimbot lets you instantly lock on and kill them from hundreds of meters away. Highly customizable loot ESP makes you never miss any valuable items ever again.
>
> Lead the leaderboard, unlock game content faster, earn more rewards, and lead your teammates to one victory after another!

30.    Depicted below is a screen capture of a player using the Cheating Software in PUBGM.  Some of the advertised features of the Cheating Software can be seen in this screen capture, including the use of ESP (Extra Sensory Perception), which allows players to see objects, non-player characters, and opponents (including player names and health information) through walls and other terrain.



31.    Plaintiffs are informed and believe, and on that basis allege, that Defendants do not sell the Cheating Software directly from their websites, including the GMS Pack and CheatNinja websites.  Instead, Defendants recruit a network of authorized "resellers," who, in turn, sell licenses to use the Cheating Software.  As explained on the CheatNinja website:  "We have a large user base and a worldwide sales network to provide professional marketing and promotion services."  In order to become a reseller of the Cheating Software, a prospective reseller need only fill out a short online application and then be approved by one of the CheatNinja administrators or moderators, such as Defendants.  The "official" suggested price of a license to download and use the Cheating Software is $38.00 for a monthly subscription and $15.00 for a weekly subscription.

32.    Plaintiffs are informed and believe, and on that basis allege, that the Cheating Software has been downloaded and used by PUBGM players thousands

Mitchell
Silberberg &
Knupp LLP
12945486.4

of times, including by players residing in the United States.  Plaintiffs also are informed and believe that Defendants have made hundreds of thousands of dollars from their distribution of, and sale of licenses to, the Cheating Software.

33.     Plaintiffs are informed and believe, and on that basis allege, that in addition to marketing and distributing the Cheating Software, Defendants and other CheatNinja representatives provide extensive and ongoing customer support and technical assistance.  For example, CheatNinja maintains an online message board forum (formerly belonging to GMSPack) where representatives, including Defendants, provide customers of the Cheating Software information and support concerning a variety of topics, such as the status of updates or "patches" to the Cheating Software, how to resolve technical issues, and how to purchase and extend licenses for the Cheating Software.  A very large portion of these message boards are dedicated to whether the Software is "safe" (*i.e.*, undetectable by PUBGM's anti-cheat technology) and what to do to avoid being detected by Plaintiffs for using unauthorized cheats and hacks.  CheatNinja also communicates with users via the instant messaging service Telegram and the online "chat room" system known as "Discord."

34.     Plaintiffs are informed and believe, and on that basis allege, that in order for the Cheating Software to operate with PUBGM it necessarily includes technology that primarily is designed to avoid, bypass, evade, or otherwise circumvent Plaintiffs' detection measures.  Defendants also specifically and aggressively advertise and promote the Cheating Software as having been designed for this unlawful purpose.  For example, on the CheatNinja website, Defendants tout that among the "features" of the Cheating Software is their "Superior Security."  In Defendants' own words, "[i]nstead of playing cat and mouse games with game developers, we focus on developing techniques for cheating that are difficult to detect in the first place."

35.     Each time a PUBGM player uses the Cheating Software to cheat in PUBGM, he or she violates the TOU, including the provision that specifically prohibits players from "us[ing] cheats, exploits, automation software or any unauthorized third party software designed to modify or interfere with [PUBGM]." Accordingly, Plaintiffs are informed and believe, and on that basis allege, that as a result of Defendants' conduct, thousands or tens of thousands of breaches of these contracts have occurred.

36.     Plaintiffs are informed and believe, and on that basis allege, that Defendants are fully aware that the use of the Cheating Software violates the TOU. Indeed, in a "pinned" (top priority) post on the CheatNinja message board (titled "How to Cheat Like a Pro"), Defendant "Rolan" offered the following "advice" (emphasis added):

> "***By cheating, you are intentionally breaching the game's terms of service.*** So this is always followed by some risks. We are the safest cheat provider, but we will never claim to be '100% impossible to get banned.' Anyone who declares this is simply irresponsible."

The Cheating Software has no purpose or function other than to enable players to violate the TOU by using cheats and exploits.  Thus, Defendants' goal is to ensure that their customers continue to receive the benefits of their contracts with Plaintiffs while they simultaneously engage in continuing harmful breaches of their obligations under these contracts.

37.     By their conduct, Defendants have caused and continue to cause serious harm to PUBGM.  Such harm is immediate, massive and irreparable, and includes (but is not limited to) the following:

(a)     Defendants irreparably harm the ability of Plaintiffs' legitimate customers in the United States to enjoy and participate in the online experience carefully created by Plaintiffs.  That, in turn, causes users to grow dissatisfied with PUBGM, lose interest, and stop playing.

Mitchell
Silberberg &
Knupp LLP

12945486.4

14

(b)     Defendants' conduct has forced Plaintiffs to spend enormous sums of money (and vast amounts of time) attempting to remediate the damage caused by the Cheating Software.  This includes creating and releasing new versions of PUBGM that counteract the Cheating Software, responding to player complaints, employing personnel to police the games to detect the use of the Cheating Software, and "banning" (*i.e.*, permanently deleting the accounts of) users who are using the Cheating Software.

(c)     Defendants' conduct harms Plaintiffs' reputation and results in the loss of significant customer goodwill, both in the United States and worldwide.

38.     Defendants' conduct has resulted in damage to Plaintiffs in an amount to be proven at trial.  By Plaintiffs' estimation, such damage is in the tens or hundreds of millions of dollars.  Unless and until Defendants are preliminarily or permanently enjoined, Plaintiffs will continue to suffer severe harm from the Cheating Software.

## COUNT I

## Trafficking In Circumvention Devices

39.     Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 38, as if set forth fully herein.

40.     PUBGM, including but not limited to its source code and audiovisual game play environments, is a copyrighted work.

41.     PUBGM uses a variety of technological measures that are designed to detect the use of cheating software and deny access to the game to individuals using such software.  Such technological measures effectively control access to the game, including access to the dynamic audiovisual elements that comprise the game.

42.     The Cheating Software is comprised of or contains technologies, products, services, devices, components, or parts thereof that primarily are

Mitchell
Silberberg &
Knupp LLP
12945486.4

15

designed or produced for the purpose of circumventing technological measures that effectively control access to PUBGM.

43.    The Cheating Software (and/or the portions thereof that circumvent PUBG's anti-cheat technologies) have no commercially significant purpose or use other than to circumvent a technological measure that effectively controls access to a copyrighted work and that protects the exclusive rights of a copyright owner. Without such circumvention measures, the Cheating Software cannot be used and will not operate, including because it will be detected and the user will be denied access to PUBGM.

44.    Defendants market the Cheating Software in the United States with knowledge that they circumvent PUBMG's technological detection measures. Indeed, Defendants' marketing specifically touts and advertises that the Cheating Software cannot be detected by Plaintiffs.

45.    As a result of the foregoing, Defendants are offering to the public, providing, importing, or otherwise trafficking in technology that violates 17 U.S.C. § 1201(a)(2).

46.    Defendants' acts constituting DMCA violations have been and continue to be performed without the permission, authorization, or consent of Plaintiffs.

47.    Defendants have violated Section 1201 of the DMCA willfully and for private commercial gain.

48.    Defendants' conduct has caused damage to Plaintiffs and has unjustly enriched Defendants, in an amount to be proven at trial.

49.    As a result of Defendants' acts and conduct, Plaintiffs have sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law.  Plaintiffs are informed and believe, and on that basis allege, that, unless enjoined and restrained by this Court, Defendants

1    will continue to violate Section 1201 of the DMCA.  Plaintiffs are entitled to

2    injunctive relief to restrain and enjoin Defendants' continuing unlawful conduct.

3        50.    As a direct and proximate result of Defendants' conduct, pursuant to

4    17 U.S.C. § 1203(c), Plaintiffs are entitled to Defendant's profits attributable to

5    their violations of 17 U.S.C § 1201.

6        51.    Alternatively, Plaintiffs are entitled to the maximum statutory

7    damages, pursuant to 17 U.S.C. § 1203(c)(A), in the amount of $2,500 with respect

8    to each violation by Defendants.

9        52.    Plaintiffs further are entitled to their attorneys' fees and full costs

10    pursuant to 17 U.S.C. § 1203(b).

11

12                              **COUNT II**

13              **Intentional Interference With Contractual Relations**

14        53.    Plaintiffs re-allege and incorporate by reference the allegations in

15    paragraphs 1 through 52, as if set forth fully herein.

16        54.    As described herein, in order to install and play PUBGM, licensed

17    users in the United States first must assent to the TOU, which is a binding, valid,

18    and enforceable contract between Tencent and players of PUBGM.

19        55.    Tencent's contracts with its users are valid and enforceable.

20        56.    Each time a purchaser of the Cheating Software uses the Cheating

21    Software in connection with PUBGM, he or she breaches the TOU.  Plaintiffs are

22    informed and believe, and on that basis allege, that thousands of such breaches

23    have taken place by Defendants' customers.

24        57.    Plaintiffs are informed and believe, and on that basis allege, that

25    Defendants are aware of both the existence and specific relevant terms of contracts

26    between Tencent and its users in the United States, including the TOU, and

27    additionally are aware of the existence and content of the Code of Conduct, by

28    virtue of their own accounts.  Specifically, Defendants are aware that the TOU and

Mitchell
Silberberg &
Knupp LLP

12945486.4

17

Code of Conduct prohibit players from using the Cheating Software.  Nevertheless, Defendants intentionally encourage and induce users of PUBGM to purchase and use the Cheating Software, knowing that the use of these products by their customers is a breach of these customers' contracts with Tencent.

58.     By inducing Plaintiffs' users to breach their contracts with Tencent, Defendants have intentionally interfered, and continue to interfere, with the contracts between Tencent and its users.

59.     As a direct and proximate result of Defendants' actions, Plaintiffs have suffered damage in an amount to be proven at trial, including but not limited to a loss of goodwill among users of the Plaintiffs' games, diversion of Plaintiffs' resources to attempt to detect and prevent the use of the Cheating Software, decreased profits, and a loss of profits from users whose accounts Plaintiffs have terminated for violation of the TOU and Code of Conduct in the United States.

60.     As a further result of Defendants' actions, Defendants have unjustly obtained specifically identifiable property, consisting of all of the proceeds attributable to the sale of the Cheating Software in the United States, and any other products or services that violate any of Plaintiffs' rights, and any additional property traceable to those proceeds.  Those proceeds, which are directly attributable to Defendants' manipulation and misuse of PUBGM and intentional interference with Tencent's contracts, rightfully and equitably belong to Plaintiffs.

61.     Defendants' intentional interference with the contracts between Tencent and its licensed users in the United States entitles Plaintiffs to injunctive relief and compensatory damages, the imposition of a constructive trust over Defendants' wrongfully obtained proceeds, and other available relief.

62.     Defendants are guilty of oppression, fraud, or malice, and Plaintiffs, in addition to actual damages, by reason thereof, are entitled to recover exemplary and punitive damages against Defendants.

Mitchell
Silberberg &
Knupp LLP

12945486.4

18

## COUNT III

## <u>Unfair Competition</u>

63.     Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 62, as if set forth fully herein.

64.     The acts and conduct of Defendants constitute unfair competition in the United States under California Business & Professions Code § 17200 *et seq.* and under California common law.

65.     As a direct and proximate result of Defendants' unfair competition in the United States, Plaintiffs have been damaged, and Defendants have been unjustly enriched, in an amount to be proven at trial for which damages and/or restitution and disgorgement is appropriate.  Such damages and/or restitution and disgorgement should include a declaration by this Court that Defendants are constructive trustees for the benefit of Plaintiffs, and an order that Defendants convey to Plaintiffs the gross receipts received or to be received that are attributable to the sale of the Cheating Software in the United States.

66.     Defendants are guilty of oppression, fraud or malice, and Plaintiffs, in addition to actual damages, by reason thereof, are entitled to recover exemplary and punitive damages against Defendants.

67.     As a result of Defendants' acts and conduct in the United States, Plaintiffs have sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law.  Plaintiffs are informed and believe, and on that basis allege, that unless enjoined and restrained by this Court, Defendants will continue to engage in unfair competition.  Pursuant to California Business & Professions Code § 17203, Plaintiffs are entitled to temporary, preliminary and permanent injunctions prohibiting further acts of unfair competition.

Mitchell
Silberberg &
Knupp LLP
12945486.4

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court enter judgment in their favor on each and every claim for relief set forth above and award it relief, including but not limited to an order:

1.     Preliminarily and permanently enjoining Defendants, their officers, employees, agents, subsidiaries, representatives, distributors, dealers, members, affiliates, and all persons acting in concert or participation with Defendants from: (i) trafficking in circumvention devices in the United States; (ii) intentionally interfering with Tencent's contracts with players in the United States; and (iii) engaging in unfair competition in the United States.

2.     Requiring Defendants to shut down the Cheating Software and any colorable copies thereof, hosted at any domain, address, location, or ISP.

3.     Requiring Defendants to deliver to Plaintiffs all copies of materials that infringe or violate any of Plaintiffs' rights, as described herein.

4.     Requiring Defendants to provide Plaintiffs with an accounting of any and all sales of products or services in the United States that infringe or violate any of Plaintiffs' rights, as described herein.

5.     Awarding Plaintiffs actual or maximum statutory damages for violation of Section 1201 of the DMCA, as appropriate, pursuant to 17 U.S.C. § 1203(c).

6.     Awarding Plaintiffs their full costs and attorneys' fees in this action pursuant to 17 U.S.C. § 1203(b) and other applicable laws, as well as pre- and post-judgment interest as appropriate.

7.     Awarding Plaintiffs exemplary and punitive damages against Defendants on Plaintiffs' cause of action for intentional interference with contractual relations.

8.     Awarding Plaintiffs restitution of Defendants' unlawful proceeds, including an accounting of any and all sales of the Cheating Software in the United

Mitchell
Silberberg &
Knupp LLP

12945486.4

20

1  States, and/or any other products or services that violate any of Plaintiffs' rights
2  described herein.

3      9.    Imposing a constructive trust over the proceeds unjustly obtained by
4  Defendants through the sales of the Cheating Software in the United States, and/or
5  any other products or services that violate any of Plaintiffs' rights described herein.

6      10.    Awarding such other and further relief as this Court may deem just
7  and appropriate.

8

9  DATED: March 5, 2021            MITCHELL SILBERBERG & KNUPP LLP

10

11                                  By:  /s/ Marc E. Mayer
12                                       Marc E. Mayer
                                         Karin G. Pagnanelli
13                                       Attorneys for Plaintiffs

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Mitchell
Silberberg &
Knupp LLP

12945486.4

21