MARC E. MAYER (SBN 190969)
  mem@msk.com
KARIN G. PAGNANELL (SBN 174763)
  kgp@msk.com
MITCHELL SILBERBERG & KNUPP LLP
2049 Century Park East, 18th Floor
Los Angeles, CA  90067-3120
Telephone: (310) 312-2000
Facsimile: (310) 312-3100

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| PROXIMA BETA PTE. LIMITED, d/b/a "Tencent Games" a Singapore Corporation, and KRAFTON, INC., a Korea Corporation, <br><br> Plaintiffs, <br><br> v. <br><br> ANDREW MARTIN a/k/a Asyhole; ANDRE SWIRSZCZUK a/k/a Girabaldi; SAMAD AHMED a/k/a Samad Hossain a/k/a Haxsamad a/k/a Sharpshooter Bangladesh and DOES 1 through 6, inclusive, <br><br> Defendants. | CASE NO. 2:21-cv-2056-MWF (MRW*x*) <br><br> Honorable Michael W. Fitzgerald <br><br> **NOTICE OF *EX PARTE* APPLICATION AND *EX PARTE APPLICATION* FOR LEAVE TO TAKE LIMITED IMMEDIATE DISCOVERY** <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** <br><br> [Declaration of Marc E. Mayer and [Proposed] Order filed concurrently herewith] |

Mitchell
Silberberg &
Knupp LLP

13070245.2

### NOTICE OF *EX PARTE* APPLICATION

PLEASE TAKE NOTICE that Plaintiffs Proxima Beta d/b/a "Tencent" and Krafton, Inc. (together, "Plaintiffs" or "Tencent") hereby apply *ex parte* pursuant to Federal Rule of Civil Procedure 26(d) and Local Rule 7-19 for leave to serve seven (7) subpoenas necessary for Plaintiffs to confirm that all necessary parties have been named in this lawsuit and to learn the identities of unnamed or alias "Doe" Defendants in this action. All of the Doe Defendants appear to have significant roles in creating, marketing, selling, distributing, and otherwise exploiting the portfolio of malicious cheats and hacks at issue in this lawsuit (*e.g.*, the "Cheating Software"), which targets Tencent's mobile multiplayer game titled "Player Unknown's Battlegrounds Mobile" ("PUBGM"). The Cheating Software allows players certain advantages such as automatically aiming weapons and seeing otherwise obscured information, all to the detriment of other, non-cheating players. Because the commercial success of PUBGM depends upon the player experience remaining enjoyable and fair for all players, the Doe Defendants' sale and distribution of the Cheating Software has caused Plaintiffs to lose millions of dollars in revenue, and to suffer irreparable damage to their goodwill and reputation.

Plaintiffs' investigation has revealed that the Doe Defendants are heavily involved in developing and distributing the Cheating Software. Does 1 (Glacier), 2 (llllllllll), 3 (MRMTT) and 4 (Sanguis) are administrators on websites that are, and have been, used to promote and sell the Cheating Software. Does 1-4 routinely communicate with Plaintiffs' customers in order to support and enable their use of the Cheating Software, recruit and organize a network of resellers, and – given their detailed technical know-how of the Cheating Software and its updates – serve as liaisons to, and/or themselves operate as, developers of the Cheating Software. Does 5 (Rolan) and 6 (SSshooter) likewise play a significant role in the operation as "Global Moderators" of retail websites that market, advertise, and promote the

sale of the Cheating Software.  In order for Plaintiffs to obtain the relief they seek, and ensure that all appropriate parties are included as Defendants in this lawsuit, expedited third party discovery is necessary to identify the Doe Defendants as well as any additional parties.  Copies of the proposed subpoenas are attached as **Exhibit 18** to the Declaration of Marc E. Mayer, filed concurrently herewith.

Good cause exists for the requested limited discovery.  This case involves violations of the Section 1201 of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1201(a)(2), (b)(1), as well as claims for intentional interference with contract and unfair competition.  These claims arise from the Doe Defendants' development, sale, and trafficking of the Cheating Software.  Both the named Defendants and Doe Defendants are responsible for developing and distributing the Cheating Software as well as facilitating and encouraging its use. Because the Doe defendants operate their business by way of anonymous online handles, Tencent has been unable to determine the true names and capacities of these individuals or entities prior to filing this lawsuit.  However, Tencent believes that the entities GoDaddy.com, LLC, Google LLC, Cloudflare, Inc., Typeform US, LLC, Wix.com, Inc., Facebook, Inc., and GitHub, Inc. are in possession of information that will either disclose the Doe Defendants' true identities, or lead to the discovery thereof, including contact information for the Defendants or IP addresses used by the Defendants to conduct business.  Accordingly, Tencent requires limited early discovery to identify all of the persons or entities that are involved with the Cheating Software and ensure that all such persons or entities are named in the action.

This Application is based upon this Notice, the attached Memorandum of Points and Authorities, the attached supporting Declaration of Marc E. Mayer, the Complaint in this action, and such other and further oral or documentary evidence and legal memoranda as may be presented at or before any hearing on this Application.  This Application is made on an *ex parte* basis in order to ensure that

the information is obtained (and, if necessary, any pleadings amended) on a timely basis.  Tencent intends to give at least 21 days of notice to the subpoenaed parties to respond to the subpoenas.  Thus, if Tencent is required to bring a noticed motion, it is likely that it will not obtain the requested information for several months, at the earliest.  Tencent then would be required to amend its Complaint and locate and serve any new or additional parties.  As a result, without the requested expedited relief this case potentially would not be at issue for many months.  In the meantime, Defendants have already sought to cover their tracks by scrubbing their online postings.  Unless Tencent is able to issue subpoenas quickly, evidence may be irrevocably lost or destroyed.

DATED: April 14, 2021

MARC E. MAYER
KARIN G. PAGNANELLI
MITCHELL SILBERBERG & KNUPP LLP


By:  _/s/ Marc E. Mayer_
Marc E. Mayer
Attorneys for Plaintiffs
Proxima Beta Pte. Limited, d/b/a
"Tencent Games" and Krafton, Inc.

Mitchell
Silberberg &
Knupp LLP

13070245.2

4

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ...................................................................................... 1

II.   STATEMENT OF THE CASE ................................................................. 3

III.  PLAINTIFFS SHOULD BE GRANTED LEAVE TO TAKE LIMITED
      DISCOVERY ........................................................................................ 10

      A.   The Requested Discovery Will Identify Specific Unnamed
           Individuals Who are Subject to Jurisdiction in This Court ........... 11

      B.   Plaintiffs Have Taken Reasonable Steps to Locate and Identify the
           Unnamed Defendants. .................................................................... 13

      C.   Plaintiffs' Claims Will Easily Withstand a Motion to Dismiss. ........ 13

      D.   The Requested Discovery is Likely to Reveal the Identities of the
           Doe Defendants. ............................................................................ 16

      E.   The Need for the Requested Discovery Outweighs Any
           Conceivable Prejudice to Defendants. ........................................... 16

IV.   CONCLUSION ..................................................................................... 18

Mitchell
Silberberg &
Knupp LLP

13070245.2

i

# **TABLE OF AUTHORITIES**

**Page(s)**

### CASES

*Adobe Sys. Inc. v. One Stop Micro, Inc.*,
   84 F. Supp. 2d 1086 (N.D. Cal. 2000)................................................... 14

*American LegalNet, Inc. v. Davis*,
   673 F. Supp. 2d 1063 (C.D. Cal. 2009).................................................. 10

*Blizzard Ent., Inc. v. Bossland GmbH*,
   No. SACV161236DOCKESX,
   2017 WL 7806600 (C.D. Cal. Mar. 31, 2017) ....................................... 14

*Blizzard Entertainment Inc. v. Ceiling Fan Software LLC*,
   28 F. Supp. 3d 1006 (C.D. Cal. 2013)................................................... 14

*Coupons, Inc. v. Stottlemire*,
   588 F. Supp. 2d 1069 (N.D. Cal. 2008).................................................. 15

*Craigslist, Inc. v. Naturemarket, Inc.*,
   694 F. Supp. 2d 1039 (N.D. Cal. 2010).................................................. 12

*Davidson & Assocs., Inc. v. Internet Gateway*,
   334 F. Supp. 2d 1164 (E.D. Mo. 2004),
   *aff'd*, 422 F.3d 630 (8th Cir. 2005) ...................................................... 14

*Geddes v. United Fin. Grp.*,
   559 F.2d 557 (9th Cir. 1977) ................................................................. 14

*Gillespie v. Civiletti*,
   629 F.2d 637 (9th Cir. 1980) ................................................................. 11

*Hallet v. Morgan*,
   296 F.3d 732 (9th Cir. 2002) ................................................................. 10

*Knapp v. Americredit Fin. Servs., Inc.*,
   204 F.R.D. 306 (S.D. W.Va. 2001) ....................................................... 16

*Maclin v. Paulson*,
   627 F.2d 83 (7th Cir. 1980) ................................................................... 11

*Munz v. Parr*,
   758 F.2d 1254 (8th Cir. 1985) ............................................................... 11

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*NobelBiz, Inc. v. Wesson*,
No. 14CV0832 W JLB,
2014 WL 1588715 (S.D. Cal. Apr. 18, 2014) ...................................................... 10

*Rose v. Abraham*,
No. 1:08CV00606-AWI-SMS,
2008 WL 3540542 (E.D. Cal. Aug. 13, 2008) ..................................................... 10

*Semitool, Inc. v. Tokyo Electron Am., Inc.*,
208 F.R.D. 273 (N.D. Cal. 2002) ............................................................... 10, 16

*Skout, Inc v. Jen Processing, Ltd*,
No. 14-CV-02341-JSC,
2015 WL 224930 (N.D. Cal. Jan. 15, 2015) ................................... 11, 12, 13, 16

*UMG Recordings, Inc. v. Doe*,
No. C 08-1038 SBA, 2008 WL 2949427 (N.D. Cal. July 30, 2008) ................. 10

*UMG Recordings, Inc. v. Doe*,
No. C 08-1193 SBA, 2008 WL 4104214 (N.D. Cal. Sept. 3, 2008) ........... 11, 16

*Valentin v. Dinkins*,
121 F.3d 72 (2d Cir. 1997) ........................................................................... 11

### STATUTES

California Business & Professions Code § 17200 *et seq.* ....................................... 15

DMCA, 17 U.S.C. § 1201(a)(2) ........................................................................ 13, 14

### OTHER AUTHORITIES

Federal Rules of Civl Procedure,
Rule 12 ............................................................................................................ 14
Rule 26 ............................................................................................................ 10
Rule 26(f) ........................................................................................................ 11
Rule 45 ............................................................................................................ 11
Rule 54 ............................................................................................................ 14

Mitchell
Silberberg &
Knupp LLP

13070245.2

iii

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

This lawsuit concerns a collection of malicious cheats and hacks (*e.g.*, the "Cheating Software") that target the immensely popular mobile multiplayer game "Player Unknown's Battlegrounds Mobile" ("PUBGM").  Defendants – seeking to damage the integrity of PUBGM while unjustly enriching themselves – have developed and sold a set of products and services designed to allow Defendants' "customers" to take advantage of in-game "cheats" that interfere with the game experience of thousands of legitimate PUBGM players.  Because the commercial success of PUBGM depends upon the player experience remaining enjoyable and fair for all players, the named and Doe Defendants' sale and distribution of the Cheating Software has caused Plaintiffs Proxima Beta and Krafton, Inc. (together, "Tencent") – the owner, publisher and operator of PUBGM – to lose millions of dollars in revenue and to suffer irreparable damage to its goodwill and reputation. Defendants, in selling, distributing, maintaining, servicing, supporting, and updating these malicious products and services, have received substantial income by selling the software via online financial transactions through a network of websites and online resellers.

By this *Ex Parte* Application, Tencent seeks leave to take circumscribed early discovery in order to ascertain the identities of certain unknown and anonymous individuals and/or entities that Tencent has reason to believe are directly involved in the promotion and sale of the Cheating Software and provide material assistance to the named Defendants in their unlawful activities.  The seven (7) subpoenas that Tencent seeks to serve via this Application, directed to various well-known U.S.-based Internet Service Providers used by unnamed or Doe Defendants in this action (specifically: GoDaddy.com, LLC, Google LLC, Cloudflare, Inc., Typeform US, LLC, Wix.com, Inc., Facebook, Inc., and GitHub,

Inc.) are necessary to both identify current Doe Defendants and ensure that all necessary defendants are included in this lawsuit.

The individuals behind the Cheating Software have gone to great lengths to hide their identities and operate through online aliases, fake names, and domain name privacy services. Before filing this lawsuit, Tencent conducted an extensive factual investigation based on publicly available information. After months of investigative work, Tencent was able to ascertain the likely identities of three individuals that it believes are responsible for developing and/or marketing the Cheating Software. However, Tencent has been unable to determine the precise identities of six additional individuals and/or entities who also have been directly involved in the promotion, sale, and servicing of the Cheating Software, who are thus named in the present Complaint only as "Doe" defendants. Accordingly, the only way to ensure that all necessary individuals are included in this lawsuit (and have been served) is to seek early discovery. The discovery that Tencent seeks by this *Ex Parte* Application should reveal the names and locations of the individuals or other parties responsible for the development, promotion, and provision of the Cheating Software and that receive payments for the sale of the Cheating Software.

In contrast to Tencent's compelling need for limited immediate discovery, there will be no prejudice to any of the defendants (named or unnamed) if the requested discovery is permitted. To the contrary, Tencent would be entitled to this discovery in the normal course. In addition, the subpoenaed party will give notice to any impacted third party, who will have a full opportunity to object or move to quash, if he or she so elects. Tencent will agree to maintain the confidentiality of any information it obtains. Should any additional discovery be required, Tencent will seek leave of Court to serve that discovery.

## II.   STATEMENT OF THE CASE

**Tencent and the PUBGM Game.**  The Plaintiffs in this case are: (1) Proxima Beta, a Singapore-based corporation and a member of the Tencent group of companies that publishes and operates the popular online mobile game PUBGM in the United States and (2) Plaintiff Krafton, Inc., a South Korea-based video game development and publishing company in the business of creating, distributing, and maintaining a portfolio of computer and console games, including PUBGM.  Krafton is the successor in interest to the company PUBG Corporation and is the owner of U.S. copyrights in PUBGM.  Together, the Plaintiffs are referred to herein as "Tencent."

Tencent is the U.S. operator and publisher of PUBGM, the mobile version of the immensely popular game "Player Unknown's Battlegrounds" ("PUBG"), owned and distributed by PUBG Corporation.  PUBGM is a mobile game app available for both Android and Apple (iOS) devices, such as smartphones, tablets, and other portable devices.

The success of PUBGM rests in part on Tencent's ability to offer a consistently compelling player experience so that their customers remain invested in the game and play it for a sustained period of time.  Especially given the substantial competition and live stream economy that has grown with, and around, PUBGM, a vital part of that player experience is the fairness and integrity of the game.  Accordingly, Plaintiffs invest an enormous amount of time and money to ensure that all players stand on equal footing and have a fair chance to defeat their opponents and progress in the game.  Maintaining proper game balance is absolutely critical to the game's success.  If that balance is artificially upset, or if there is a perception that players are cheating or have an unfair advantage, then players will grow frustrated with the game and stop playing.

**Defendants' Cheating Software.**  Defendants collectively are or were engaged in developing, updating, marketing, distributing, selling, and supporting

the PUBGM Cheating Software, including the "SharpShooter PUBG Mobile Android Cheat" and the "SharpShooter PUBG Mobile iOS Cheat." *See* Declaration of Marc E. Mayer in Support of *Ex Parte* Application for Leave to Take Limited Immediate Discovery ("Mayer Decl."), ¶ 1.  Defendants have marketed, sold, and offered customer support for the PUBGM Cheating Software via the website www.cheatninja.com and its predecessor at www.gmspack.com (hereinafter individually and collectively the "CheatNinja Website") and through authorized "resellers" that, in turn, advertise the Cheating Software through message board postings on the CheatNinja Website and other similar websites.  *Id.* ¶ 3.

The CheatNinja Website has claimed that CheatNinja is the "leading mobile cheat developer & publisher since 2018."  *Id.*  CheatNinja is a "rebrand" of three pre-existing cheating and hacking developers and sellers that purportedly "joined forces":  "Autoskillz," "SharpShooter," and "GMSPack."  *Id.* ¶¶ 2-3.  According to the CheatNinja website, "Autoskillz" is "one of the world's first game cheat developer[sic] to explore the mobile landscape;" "Sharpshooter" is a "top mobile cheat developer" whose software "laid the foundation of the mobile cheat industry;" and "GMSPack" is a "professional cheat sales team, dedicated to providing technical support, marketing and promotion services for individual developers and teams through cheats' life cycle."  Compl. ¶ 28.

The PUBGM Cheating Software enables PUBGM players to cheat in the game by, *inter alia*, automatically aiming a player's weapon, expanding a player's field of vision, illuminating opponents, and displaying information such as the locations and health status of hidden or obscured opponents or the location of "valuable items."  Compl. ¶ 29.  CheatNinja advertises the SharpShooter PUBG Mobile Android as enabling players to: "[k]eep track of the status and exact location of all enemies at all times with player ESP (boxes, skeletons, HP, distance, weapons, etc.), and with precise aimbot … instantly lock on and kill [opponents]

from hundreds of meters away. Highly customizable loot ESP makes you never miss any valuable items ever again.  Lead the leaderboard, unlock game content faster, earn more rewards, and lead your teammates to one victory after another!" *Id.*

**Tencent's Initial Investigation.**  Prior to filing this lawsuit, Tencent conducted a lengthy investigation in an effort to ascertain the identities of the persons and/or entities responsible for the Cheating Software.  *See* Mayer Decl. ¶¶ 2-11.  After months of investigation, Tencent discovered that a variety of different individuals appear to be responsible, both together and separately, for creating, marketing, selling, updating, and distributing the Cheating Software, operating the various retail websites used to distribute the Cheating Software, and engaging and communicating with customers and potential customers in order to educate and train them on how best to use the Cheating Software.  *Id.* ¶ 5.

Through their investigation, Tencent was able to ascertain the identity of three individuals that it believes are partially responsible for developing and selling the Cheating Software.  (1) **Defendant Andrew Martin** is an individual residing in Canyon Country, California who uses the username "Asyhole," among other online aliases and addresses, to operate as one of several "global moderators" for the CheatNinja Website.  *Id.* ¶ 5(b).  In that role, Martin markets, advertises, promotes, and otherwise facilitates the sale of the Cheating Software.  *Id.*; Compl. ¶ 11.  (2) **Defendant Andre Swirszczuk** is an individual residing in or about Rudolstadt, Germany who is believed to be one of the founders of two prominent providers of Cheating Software, "Autoskillz" and "Sharpshooter Corporation," and is among the lead developers and/or marketers of the Cheating Software.  Compl. ¶ 12; *see also* Mayer Decl. ¶ 5(a).  Swirszczuk is also believed to be one of the administrators of the website www.sharpshooterdevelopers.com, which has promoted the Cheating Software offered by www.gmspack.com and provided links to the CheatNinja.com website.  *Id.*  In those roles, Swirszczuk is among the

individuals chiefly responsible for creating, producing, maintaining, marketing, advertising, supporting, and monetizing the Cheating Software.  *Id.*  (3) **Defendant Samad Ahmed a/k/a Samad Hossain** is an individual residing in or about Cumilla, Bangladesh who is believed to distribute and re-sell the Cheating Software through the website www.cheatninja.io.  Compl. ¶ 13; Mayer Decl. ¶ 5(c).

However, Plaintiffs have not yet been able to determine the identities of many of the other individuals and/or entities that are responsible for selling the Cheating Software, developing the Cheating Software, maintaining websites and social media accounts for the Cheating Software, providing customer support for the Cheating Software, or inducing and encouraging PUBGM players to purchase and use the Cheating Software.  Mayer Decl. ¶ 6.  Specifically:

●      Defendants Doe 1 a/k/a Glacier, Doe 2 a/k/a llllllllll, Doe 3 a/k/a MRMTT (or "mrmtt"), and Doe 4 a/k/a Sanguis are or were administrators of the CheatNinja website and message board and/or their predecessor versions at www.gmspack.com.  Mayer Decl. ¶ 5(d); Compl. ¶ 14.  In that role, these individuals communicate with Plaintiffs' customers in order to support and enable their use of the Cheating Software, and serve as liaison to, and/or themselves operate as, developers of the Cheating Software.  *Id.*  Among other activities, Glacier and llllllllll assist customers in operating the Cheating Software, give advice to customers as to how to avoid being caught or detected by Plaintiffs for using the Cheating Software, and communicate to users about updates and improvements to the Cheating Software.  *Id.*  Glacier and llllllllll also are involved in recruiting, hiring, and communicating with individual resellers of the Cheating Software.  *Id.*  After extensive investigation, Tencent has been unable to verify definitively the names and identities of Does 1-4.  Mayer Decl. ¶ 6.

●      Defendants Doe 5 a/k/a Rolan and Doe 6 a/k/a SSshooter are, along with Defendant Martin, "Global Moderators" of the retail website Cheat Ninja,

and/or its predecessor website at www.gmspack.com.  Mayer Decl. ¶ 5(d); Compl. ¶ 15.  In that role, these individuals market, advertise, promote, and otherwise facilitate the sale of the Cheating Software, including by recruiting, hiring, and communicating with individual "resellers" of the Cheating Software.  *Id.*  After extensive investigation, Tencent has been unable to verify definitively the names and identities of Does 5 and 6.  Mayer Decl. ¶ 6.

**The Requested Discovery.**  In order to obtain complete relief in this action, Plaintiffs must locate and name all of the individuals and entities that are responsible for developing, distributing, and marketing the Cheating Software.  Thus, Plaintiffs have requested the issuance of subpoenas to: (1) GoDaddy.com, LLC; (2) Google LLC; (3) Cloudflare, Inc.; (4) Typeform US, LLC; (5) Wix.com, Inc.; (6) Facebook, Inc.; (7) GitHub, Inc.  *See id.* ¶ 12, Ex. 18.

**1.**     **GoDaddy.com, LLC** is a domain name registrar and web hosting company.  Plaintiffs have reason to believe that Defendants, including Doe Defendants, registered many of the known website domains used to sell, promote, and support the Cheating Software using GoDaddy and its affiliated privacy service, DomainsByProxy.  Mayer Decl. ¶ 13.  These include among others GMSPack.com, Cheatninja.com, Sharpshootershop.com, GMSPack.net, GMSPack.org, and GMSPack.shop.  *Id.*  Accordingly, GoDaddy will have information and data concerning the registrant(s) of the website domain name and the location of those registrants, which is expected to include Doe Defendants.  *Id.*

**2.**     **Google LLC** is a company that operates YouTube channels and videos through its video hosting service available at www.youtube.com and operates the Gmail electronic mail service.  *Id.* ¶ 14.  Google also provides, or has provided, user accounts relating to "Google Maps" and its "Google Plus" social networking service.  *Id.*  Individuals believed to be responsible for developing, operating, and/or trafficking the Cheating Software posted YouTube videos and maintained YouTube channels affiliated with efforts to sell the Cheating Software

and encourage PUBGM players to use it.  *Id.*  These users and channels include, among others, a "Sharpshooter Official" channel, a "GMSPack & Autoskillz" channel, and a "CheatNinja" channel.  *Id.*  Other individuals believed or suspected to be associated with the CheatNinja websites also are understood to maintain Gmail accounts, or to have maintained accounts relating to Google Maps and/or Google Plus.  *Id.*  Because these individuals necessarily provided certain identifying information, including IP address information, when creating and accessing accounts necessary to post YouTube videos, create and maintain YouTube channels, or maintain Gmail accounts, Google is likely to have information concerning the identity of the individuals responsible for the development, promotion, and/or trafficking of the Cheating Software, including the Doe Defendants.

      **3.**    **Cloudflare, Inc.** is a company that offers security and content delivery services to websites, doing so in a manner that allows websites to hide the identity and location of their own servers.  *Id.* ¶ 15.  Plaintiffs have reason to believe that multiple websites owned, operated, or maintained by Defendants, including the Doe Defendants, rely on Cloudflare's services for such purposes and have necessarily provided identifying account information to Cloudflare.  *Id.* These websites include, among others, GMSPack.com, Cheatninja.com, Autoskillz.net, and GMSPack.shop.  *Id.*  Accordingly, it is expected that **Cloudflare, Inc.** will have information and data concerning Doe Defendants connected with these websites.

      **4.**    **Typeform US, LLC** is a company offering a web-based service that permits websites to solicit and collect information from users.  *Id.* ¶ 16.  Plaintiffs have reason to believe that Defendants, including Doe Defendants, have made use of Typeform for purposes such as soliciting online "applications" from potential resellers of the Cheating Software.  *Id.*  Use of Typeform requires creation of an online account and provision of data such as e-mail information.  *Id.*  Accordingly,

it is expected that **Typeform US, LLC** will have information and data concerning the identity of the individuals responsible for approving and supervising resellers of the Cheating Software.

5.     **Wix.com, Inc.** is a company offering website-related services that include domain name registration, website design, and website hosting. *Id.* ¶ 17. Plaintiffs have reason to believe that various Defendants, including Doe Defendants, have employed Wix.com services to register, host, and/or develop websites devoted to promotion and sale of the Cheating Software, and have done so through the creation and use of online Wix.com accounts. *Id.* Such websites include: Sharpshooterdevelopers.com; Sharpshootershop.com; and GMSpack.store. *Id.* Accordingly, **Wix.com, Inc.** will have account information and data concerning Defendants connected with these websites, expected to include Doe Defendants.

6.     **Facebook, Inc.** Multiple profile pages exist on Facebook that are dedicated to promoting the Cheating Software or otherwise indicate an affiliation with the Cheating Software and those responsible for it. *Id.* ¶ 18. These pages include profiles with names such as "SharpShooterHack," "CheatNinjaOfficials," and "PubgSharpshooter." *Id.* Relevant profiles can also be found on Facebook's related Instagram service. *Id.* Facebook will accordingly have information regarding the account information and location of these pages that is expected to assist with identification of the Doe Defendants.

7.     **GitHub, Inc.** is a website offering online tools and hosting for software development. *Id.* ¶ 19. Plaintiffs have reason to believe that Defendants, including Doe Defendants, have used GitHub to maintain personal and/or group pages, assist in the software development process, and to facilitate the distribution of the Cheating Software to the public. *Id.* Accordingly, it is expected that GitHub will have account information and other data concerning the Cheating Software that will assist with identification of the Doe Defendants.

1    With respect to all of these subpoenas, Plaintiffs seek to obtain: (1) the

2    names, addresses, email addresses, and other identifying information of any

3    persons or entities who have registered or who own, use, or pay for the accounts at

4    issue; and (2) each Internet Protocol address used to access the above-mentioned

5    accounts during the period in which the Cheating Software was made available,

6    marketed, and/or offered for sale to the public (*i.e.*, approximately 2018 to the

7    present).  *See* Exhibit 18.  In other words, the subpoenas seek only ***identifying***

8    information that is necessary for this case to proceed.  In the event that Plaintiffs

9    later determine that it requires additional early discovery, it will apply to the Court

10   for leave to serve such additional discovery.

11   **III.    PLAINTIFFS SHOULD BE GRANTED LEAVE TO TAKE LIMITED**

12   **DISCOVERY**

13   District courts have broad discretion in scheduling discovery, including

14   broad discretion to order expedited discovery prior to a Rule 26 conference.  *Hallet*

15   *v. Morgan*, 296 F.3d 732, 751 (9th Cir. 2002).  The court may authorize expedited

16   discovery for "good cause."  *Semitool, Inc. v. Tokyo Electron Am., Inc.*, 208 F.R.D.

17   273, 276 (N.D. Cal. 2002); *accord American LegalNet, Inc. v. Davis*, 673 F. Supp.

18   2d 1063, 1066 (C.D. Cal. 2009); *NobelBiz, Inc. v. Wesson*, No. 14CV0832 W JLB,

19   2014 WL 1588715, at *1 (S.D. Cal. Apr. 18, 2014); *Rose v. Abraham*, No.

20   1:08CV00606-AWI-SMS, 2008 WL 3540542, at *3 (E.D. Cal. Aug. 13, 2008);

21   *UMG Recordings, Inc. v. Doe*, No. C 08-1038 SBA, 2008 WL 2949427, at *3

22   (N.D. Cal. July 30, 2008) (collecting cases).

23   Good cause generally exists "where the need for expedited discovery, in

24   consideration of the administration of justice, outweighs the prejudice to the

25   responding party."  *Semitool*, 208 F.R.D. at 276.  In determining whether good

26   cause exists for pre-service discovery, courts consider whether: (1) the plaintiff can

27   identify the missing party with sufficient specificity such that the Court can

28   determine that defendant is a real person or entity who could be sued in federal

Mitchell
Silberberg &
Knupp LLP

13070245.2

10

1    court; (2) the plaintiff has identified all previous steps taken to locate the elusive

2    defendant; (3) the plaintiff's suit against defendant could withstand a motion to

3    dismiss; and (4) the plaintiff has demonstrated that there is a reasonable likelihood

4    of being able to identify the defendant through discovery such that service of

5    process would be possible.  *Skout, Inc v. Jen Processing, Ltd*, No. 14-CV-02341-

6    JSC, 2015 WL 224930, at *2 (N.D. Cal. Jan. 15, 2015).

7         As set forth below, good cause exists for the requested, and very limited,

8    expedited discovery.[1]

9    **A.   <u>The Requested Discovery Will Identify Specific Unnamed</u>**

10   **<u>Individuals Who are Subject to Jurisdiction in This Court.</u>**

11        Under the first factor, "the Court must examine whether the Plaintiff has

12   identified the Defendants with sufficient specificity, demonstrating that each

13   Defendant is a real person or entity who would be subjected to jurisdiction in this

14   Court." *Skout, Inc*, 2015 WL 224930, at *2.  Here, Tencent's Complaint includes

15   detailed allegations that each Doe Defendant is a real individual who has

16   undertaken a demonstrated public-facing effort to market and sell the Cheating

17   Software, and committed considerable time and resources to expand a growing

18   network of sales websites and resellers.  Compl. ¶¶ 15-16.  Tencent has identified

19   the Doe Defendants' specific online aliases and personas, which operate as a kind

20   _____

21   [1] Courts also routinely allow early discovery to identify anonymous or "Doe"
     defendants.  *See Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980) ("[W]here
22   the identity of [the] alleged defendant[] [is] not [] known prior to the filing of a
     complaint[,] the plaintiff should be given an opportunity through discovery to
23   identify the unknown defendants, unless it is clear that discovery would not
     uncover the identities, or that the complaint would be dismissed on other
24   grounds[.]"); *Valentin v. Dinkins*, 121 F.3d 72, 75-76 (2d Cir. 1997); *Munz v. Parr*,
     758 F.2d 1254, 1257 (8th Cir. 1985); *Maclin v. Paulson*, 627 F.2d 83, 87 (7th Cir.
25   1980).  Such discovery is especially appropriate where individuals
     "pseudonymously or anonymously" commit tortious acts over the Internet.  *UMG*
26   *Recordings, Inc. v. Doe*, No. C 08-1193 SBA, 2008 WL 4104214, at *4 (N.D. Cal.
     Sept. 3, 2008) ("In Internet infringement cases, courts routinely find good cause
27   exists to issue a Rule 45 subpoena to discover a Doe defendant's identity, prior to a
     Rule 26(f) conference, where a plaintiff makes a prima facie showing of
28   infringement, and there is no other way to identify the Doe defendant, and there is
     a risk an ISP will destroy its logs prior to the conference.") (citation omitted).

Mitchell
Silberberg &
Knupp LLP
13070245.2

11

of signature for their online activity. *Id.*, *see also* Mayer Decl. ¶ 2(d). The online activity "signed" by the Doe Defendants by way of their online handles is blatantly in service of promoting widespread sales and use of the Cheating Software by Tencent's users through the above-described CheatNinja websites. *Id.* Therefore, third party discovery into the registration and host activity of those websites are extremely likely to be able to uncover substantially more information about the Doe Defendants. The requested discovery is necessary to ensure that these individuals are identified, and if possible, named as defendants in this action. What's more, some aspects of Plaintiffs' requested relief, such as an order and injunction requiring Defendants to shut down the Cheating Software, provide an accounting and deliver infringing materials, are only possible if aimed at an identified individual.

Tencent has also sufficiently alleged that the unnamed Doe Defendants are subject to the jurisdiction of this Court. *See* Compl. ¶ 7; *see also Skout, Inc*, 2015 WL 224930, at *2 (finding that the allegations of the Plaintiff's complaint showed personal jurisdiction over unnamed defendants). While Tencent believes that the unnamed Doe Defendants will be a mixture of U.S. and foreign individuals, it is well-established that when foreign individuals offer services designed to target the computer servers of companies with U.S. operations, especially with the purpose of interfering U.S.-located customers, they are subject to personal jurisdiction in U.S. federal courts. *See, e.g., Craigslist, Inc. v. Naturemarket, Inc.*, 694 F. Supp. 2d 1039, 1053 (N.D. Cal. 2010) (personal jurisdiction established in California where nonresident defendant: (i) maintained commercial website that was interactive and open California residents; (ii) knowingly and intentionally accessed and used Plaintiff's website and developed, marketed, and sold software for the sole purpose of enabling users to bypass the security measures of Plaintiff's website, in violation of its TOUs; and (iii) directly targeted California and knew

1    that Plaintiff would suffer the brunt of its harm in California because Plaintiff was

2    headquartered and maintained its website in California).

3    **B.    Plaintiffs Have Taken Reasonable Steps to Locate and Identify**

4    **the Unnamed Defendants.**

5    "Under the second factor, the party should identify all previous steps taken

6    to locate the elusive defendant." *Skout, Inc*, 2015 WL 224930, at *3.  Here,

7    Tencent has conducted an extensive preliminary investigation.  Mayer Decl., ¶¶ 2-

8    10 & Exs. 1-16.  This comprehensive investigation revealed that, while working

9    with the named Defendants, the Doe Defendants have taken steps to obscure their

10   identities, including by operating exclusively using online aliases.  *Id.* ¶ 5, 8-10.

11   Plaintiffs currently cannot tie the online aliases to real names without additional

12   information maintained by the above-described third parties.  In the meantime,

13   Defendants are already working to destroy evidence.  *Id.* ¶ 11 & Ex. 17.  As a

14   result, the only avenue available to Plaintiffs in order to both collect core evidence

15   in this case before it is destroyed, as well as serve judicial economy, is to seek

16   early discovery to identify those unnamed individuals responsible for the Cheating

17   Software.

18   **C.    Plaintiffs' Claims Will Easily Withstand a Motion to Dismiss.**

19   Plaintiffs' claims are straightforward and strong – and would easily survive a

20   Motion to Dismiss.  The DMCA, Section 17 U.S.C. § 1201(a)(2), provides that

21   "[n]o person shall manufacture, import, offer to the public, provide, or otherwise

22   traffic in any technology, product, service, device, component, or part thereof, that

23   … is primarily designed or produced for the purpose of circumventing a

24   technological measure that effectively controls access to a work protected under

25   this title[.]"  Tencent has sufficiently alleged all elements of this claim.  Plaintiffs

26   allege that the game PUBGM is a protected work, Compl. ¶ 10, and that Plaintiffs

27   have long maintained numerous technological measures within PUBGM that

28   effectively control access to the game, "including access to the dynamic

audiovisual elements that comprise the game." *Id.* ¶ 41.  The Complaint explains
in detail, along with several exemplar images, how the Cheating Software is
designed, marketed, sold and used for the sole purpose of enabling PUGBM
players to circumvent the extensive technological measures put in place to deny
access to individuals using such software. *Id.* ¶¶ 29-30, 34, 41-44.  In particular,
Plaintiffs include specific factual allegations that describe Defendants' marketing
of the Cheating Software to specifically circumvent anti-cheating technologies and
violate the DMCA.  *Id.* ¶ 34.  Further, Plaintiffs explain that the Cheating Software
has "no commercially significant purpose or use other than to circumvent a
technological measure that effectively controls a copyrighted work." *Id.* ¶ 43.
These allegations are more than sufficient to state a claim for violation of DMCA
§ 1201(a)(2).  *See Blizzard Ent., Inc. v. Bossland GmbH*, No.
SACV161236DOCKESX, 2017 WL 7806600, at *4 (C.D. Cal. Mar. 31, 2017)
(Plaintiffs' very similar allegations that defendants' Cheating Software was
"designed to circumvent technological measures that control access to a copyright-
protected work" satisfied a similar, if not higher, standard to obtain a default
judgment under Rule 54.).[2]

Plaintiffs are also likely to prevail on their claim for Intentional Interference
with Contractual Relations.  Terms of Use ("TOU") agreements, such as Plaintiffs'
TOUs and End User License Agreements for online services here, are enforceable
contracts under California law.  *Blizzard Entertainment Inc. v. Ceiling Fan
Software LLC*, 28 F. Supp. 3d 1006, 1015 (C.D. Cal. 2013) (granting summary
judgment against hack maker for inducing breach of Blizzard's EULA); *see also
Adobe Sys. Inc. v. One Stop Micro, Inc.*, 84 F. Supp. 2d 1086, 1089-93 (N.D. Cal.
2000) (end user license agreement valid under California law); *Davidson &*

---

[2] Similar to a Rule 12 inquiry, a Default Judgment inquiry requires the Court to
evaluate the sufficiency of a Complaint's well-pleaded allegations.  *Id.* at *2,
*Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977).

*Assocs., Inc. v. Internet Gateway*, 334 F. Supp. 2d 1164, 1170-71, 1177-78 (E.D. Mo. 2004), *aff'd*, 422 F.3d 630 (8th Cir. 2005).  As is alleged in the Complaint, the Defendants' conduct blatantly violates Plaintiffs' TOUs and End User License Agreements, which expressly prohibit users from using precisely the type of Cheating Software Defendants employ.  Compl. ¶¶ 24-25.  The Complaint alleges and explains that these agreements must be personally reviewed and assented to by each and every PUBGM user in order to play the game.  *See id.* ¶ 26.  In other words, the Complaint adequately alleges that every PUBGM user who use the Cheating Software in the game has also necessarily reviewed and assented to enforceable agreements that clearly prohibit the software.  Furthermore, as is alleged in the Complaint, Defendants intentionally induced other users to breach the TOU and End User Agreement by selling the Cheating Software, despite their knowledge that licensed PUBGM users were required to assent to those agreements.  *Id.* ¶¶ 57-58.

Lastly, Plaintiffs have more than adequately alleged an Unfair Competition claim.  California Business & Professions Code § 17200 *et seq.* defines "unfair competition" as an "unlawful, unfair or fraudulent business act or practice…."  Common law unfair competition has four elements: (1) a substantial investment of "time, skill or money in developing its property"; (2) appropriation and use of the property by another company at little or no cost; (3) the appropriation and use of the "property was without the authorization or consent"; and (4) injury by the appropriation and use by the other company.  *Coupons, Inc. v. Stottlemire*, 588 F. Supp. 2d 1069, 1075 (N.D. Cal. 2008).  Plaintiffs have undoubtedly invested substantial time, skill and money in developing both the highly successfully and lucrative PUBGM game, as well as maintaining anti-cheat technology.  *See, e.g.,* Mayer Decl. ¶¶ 2-11.  Meanwhile, Defendants' Cheating Software uses and interacts with aspects of this technology in order to subvert it, and sells the Software to Plaintiffs' own customers.  *Id.*

**D.      The Requested Discovery is Likely to Reveal the Identities of the Doe Defendants.**

"The final factor concerns whether the discovery sought will uncover the identities of the Doe Defendants." *Skout, Inc*, 2015 WL 224930, at \*4.  Here, the requested discovery will likely reveal the identities of the entities or individuals primarily responsible for the development, marketing, and sale of the Cheating Software, including the "Doe" defendants, because the discovery seeks identifying information that each Doe individual must provide to the target Internet service providers in order to use their services.

**E.      The Need for the Requested Discovery Outweighs Any Conceivable Prejudice to Defendants.**

The proposed (limited) expedited discovery will serve the interests of justice, as it will ensure that all necessary defendants are included in this lawsuit as soon as possible.  *See Knapp v. Americredit Fin. Servs., Inc.*, 204 F.R.D. 306, 308-09 (S.D. W.Va. 2001) (granting expedited discovery to determine the identity of Doe defendants because it "further[s] the goal of assuring that the necessary parties are joined and participating in this action at the earliest possible date"); *Semitool*, 208 F.R.D. at 277 (reasoning that expedited discovery is justified where it will "substantially contribute to moving th[e] case forward"); *see also* Mayer Decl., ¶¶, 3-5, 11-16.  Here, it is critical that Plaintiffs quickly identify all of the individuals responsible for the Cheating Software, including and especially the Doe Defendants in this lawsuit, and begin the process of serving them for several reasons:

***First***, online data is often ephemeral in nature and is only retained for a limited period of time, before it is destroyed in the ordinary course of business. *See UMG Recordings, Inc.*, 2008 WL 4104214, at \*5 (finding good cause for expedited discovery where there is a risk an online service provider might destroy logs and records of a defendant's identifying information).  The risk of losing

Mitchell
Silberberg &
Knupp LLP

13070245.2

16

1   critical data and evidence is particularly acute here, where during the time that

2   Plaintiffs are waiting for service to be completed, those responsible for the

3   Cheating Software may undertake efforts to make themselves even more difficult

4   to find.  They may switch service providers or domain name providers.  They may

5   transfer assets to other corporations or other individuals.  They may use alternative

6   payment processors or financial institutions, or may move to untraceable

7   currencies such as Bitcoin.

8        ***Second***, Tencent has already discovered that the Defendants are actively

9   destroying evidence (*e.g.*, by deleting information from their public accounts).

10   Mayer Decl. ¶ 11 & Ex. 17.  Until the unnamed individuals are added to this

11   lawsuit and placed on notice, there is nothing preventing them from further

12   destroying or concealing evidence.

13        ***Finally,*** if subpoenas reveal the existence of additional individuals located

14   outside the United States, service on those individuals will likely need to be

15   effectuated via the Hague Convention or other international treaties.  The result

16   could be yet another several months (or more) to complete service.  It certainly is

17   in the interests of justice for all necessary parties to be identified, and service

18   commenced, immediately.

19        In contrast to the foregoing, there will be no prejudice to Defendants (both

20   named and unnamed) if the Application is granted.  If the Court grants this

21   Application, Plaintiffs will promptly serve the subpoenas and will provide a

22   reasonable response date for the subpoena (no less than 21 days).  *See id.*, ¶¶ 21-

23   22.  The subpoenaed parties will be able to notify any affected persons that

24   Plaintiffs are seeking their identities and all parties will have the opportunity to

25   raise objections by filing a motion to quash in this Court before the return date of

26   the subpoena.  What's more, the subpoenaed parties will be asked for information

27   that they would have eventually provided in the normal course of discovery, so it

28

Mitchell
Silberberg &
Knupp LLP
13070245.2

17

imposes no extra burden for these same third parties to respond to expedited discovery.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs' *Ex Parte* Application for leave to take expedited discovery should be granted.

DATED: April 14, 2021                    MITCHELL SILBERBERG & KNUPP LLP


By:   /s/ Marc E. Mayer
      Marc E. Mayer
      Karin G. Pagnanelli
      Attorneys for Plaintiffs